In re **TENNOHIO TRANSPORTATION COMPANY Jointly Administered with Marpam Truck & Trailer Company, Garland Transportation Company and Commercial Trailer Company, Debtors.**

Nos. 97–57772, 97–57773, 97–57776, 97–57777.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Sept. 6, 2001.

E. James Hopple, Daniel R. Swetnam, Schottenstein, Zox & Dunn Co., LPA, Columbus, OH, for debtors.

Daniel A. DeMarco, Sidney L. Williams, Hahn Loeser & Parks LLP, Columbus, OH, for Navistar Financial Corporation.

Richard Boydston, Ulmer & Berne, Cincinnati, OH, for the Committee of Unsecured Creditors.

### OPINION AND ORDER DETERMINING VALUE OF NAVISTAR'S COLLATERAL FOR PURPOSES OF ADEQUATE PROTECTION PAYMENTS AND RESOLVING REMAINING ISSUES CONCERNING DEBTORS' OBJECTION TO CLAIM

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court to consider certain factual issues which were not resolved by the Opinion and Order on Crossmotions for Summary Judgment entered February 7, 2000. The debtors and Navistar Financial Corporation ("Navistar") agreed to consolidate trial of these issues with the debtors' complaint for recovery of preferential transfers. Both matters were tried to the Court over a period of several days. Thereafter, at the Court's request, the parties submitted post-trial briefs in lieu of oral closing arguments.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this district. This is a core matter which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(B) and (C).

The February 7, 2000 opinion and order decided the parties' crossmotions for summary judgment on the debtors' objection to Navistar's proof of claim and their motion for a determination of the value of Navistar's secured claim. Left unresolved was whether all of the adequate protection payments received by Navistar arose from actual depreciation in the value of its collateral caused by the imposition of the automatic stay and the debtors' use of the collateral. The Court instructed:

> Actual depreciation can be determined by subtracting the net sales proceeds plus any reconditioning costs associated with that sale from the replacement value of the Tractor unit at the time of the request for adequate protection. Any adequate protection payments received by Navistar in excess of that depreciation calculation should be returned to the debtors.

*In re TennOhio Transportation Co.*, 247 B.R. 715, 722 (Bankr.S.D.Ohio 2000).

Navistar and the debtors, as part of a refinancing of various obligations, entered into a series of Commercial Refinance and Consolidation Agreements ("Loan Agreements"). Pursuant to the Loan Agreements, the debtors granted Navistar a security interest in various tractors and one trailer. At the time the debtors filed their chapter 11 petition on August 25, 1997 (the "Petition Date"), Navistar held perfected security interests in one hundred forty-five (145) International tractors, one specialty

Kentucky trailer, and one specialty Peterbilt tractor (collectively, the "Vehicles"). The Vehicles were in the debtors' possession and had been, and would continue to be, used after the Petition Date in the operation of the debtors' transportation business. The debtors owed Navistar $7,109,197.61 under the Loan Agreements on the Petition Date.

On August 29, 1997, just four days after the Petition Date, Navistar filed a motion for relief from stay seeking among other relief to repossess the Vehicles. The debtors and Navistar subsequently entered into a stipulation and agreed order (the "Stipulation") to resolve the motion. In the Stipulation the debtors acknowledged that the Vehicles were necessary for an effective reorganization. The parties agreed that in return for providing adequate protection to Navistar, the debtors would retain and use the Vehicles from and after the Petition Date. A major component of the adequate protection comprised the debtors' obligation to make monthly payments of $950 for each of the Vehicles except for the specialty Kentucky trailer and the specialty Peterbilt tractor. For these two units, a different adequate protection payment applied.

Also as part of the resolution of Navistar's motion for relief from stay, the debtors surrendered thirty-five (35) of the International tractors. On November 6, 1997, the Court entered an agreed order authorizing the debtors to sell twenty-one (21) of these tractors to Miami Valley International Trucks, Inc. for $882,000. Navistar received the entire net proceeds from this sale.

Navistar arranged for the re-marketing and sale of the other fourteen (14) tractors. The gross proceeds generated by the sale were $633,000. Reconditioning costs of $53,025.86 and sales commissions of $40,650 resulted in net proceeds to Navistar of $539,324.14.

The debtors learned in May or early June 1998 that Sears, their largest customer, did not intend to renew their contract which was to expire on June 30, 1998. The debtors subsequently determined that they would discontinue their transportation business operations as of June 30, 1998. Between the Petition Date and June 30, 1998, the debtors made adequate protection payments to Navistar of $1,034,756.64.

Following the discontinuation of business operations, the debtors and Navistar entered into an amended and supplemental stipulation and agreed order on July 14, 1998 (the "Second Stipulation"). The Second Stipulation granted Navistar relief from the automatic stay and provided that the Vehicles remaining in the debtors' possession would be actively marketed on a retail basis through the used truck centers owned and operated by Navistar's affiliates throughout the United States. Determination of Navistar's claim would occur after the Vehicles had been sold.

Pursuant to the terms of the Second Stipulation, Navistar sold the remaining vehicles over the next twelve (12) months. The sale of these one hundred twelve (112) units generated gross proceeds of $5,333,569. After deducting reconditioning expenses of $523,892.26 and sales commissions of $469,175, Navistar netted $4,340,501.74.

 In order to resolve this matter, the Court must first determine the replacement value of the Vehicles as of the Petition Date (or more precisely, when Navistar first made its demand for adequate protection four days later). Replacement value in this context is what the debtors, or any similar purchaser, would have to pay for like equipment less any portion of that price attributable to reconditioning costs. *See Associates Commer-*

*cial Corp. v. Rash,* 520 U.S. 953, 965 n. 6, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). The Court will subtract from this replacement value the net proceeds Navistar received from the sale of the Vehicles. A comparison of this sum with the total of the adequate protection payments made by the debtors will then determine whether Navistar will have to return any part of the payments.

■ The debtors contend that the Vehicles had a replacement value of $6,728,114 on the Petition Date. Because this amount is less than the sum of the net sales proceeds and the adequate protection payments ($6,796,582.52), the debtors seek return of $68,468.52. Navistar, on the other hand, argues for a replacement value of $7,676.900. If its valuation is correct, Navistar would be entitled to retain all of the debtors' adequate protection payments.

The debtors and Navistar rely for their valuations on the appraisal reports prepared by their experts, each of whom testified at trial. In addition to these experts, they rely to a lesser extent on the valuation testimony of various employees, both past and present, of Navistar and its affiliates. The Court reviewed the appraisal reports and other exhibits pertaining to the value of the Vehicles and weighed the testimony of the witnesses.

David A. Gaston, the debtors' expert, has been employed by PriceWaterhouse-Coopers LLP and its predecessors since 1963. He has been the firm's expert in the trucking industry since the mid–1980's. In 1996, he took on the national role as the firm's trucking industry consultant.

The debtors retained PriceWaterhouse-Coopers soon after the Petition Date. At the outset, the firm served a general role as an advisor, but early on in the chapter 11 proceedings, was asked to become involved in valuation issues. Mr. Gaston headed up this effort.

Mr. Gaston visited the debtors' Columbus facility on three to four occasions beginning in early September 1997. On his first visit, he met with the maintenance supervisor, examined the maintenance records and equipment information, and toured the facility. He estimates several dozen International tractors were on-site at that time, but no more than forty to fifty. On each of his visits, he looked to see what equipment was on-site and made a visual inspection. Mr. Gaston also visited the debtors' Dallas facility on one occasion. His general observations were that the equipment was well-maintained and in good condition.

Three written appraisal reports were prepared under Mr. Gaston's direction. The first report dated June 18, 1998, appraised the debtors' entire fleet as of June 1, 1998, at retail, wholesale, and liquidation values for purposes of the debtors' reorganization. Mr. Gaston defined "retail value" as the value of equipment on-site for sale to the public in a roadworthy condition. It assumes a certain amount of reconditioning to bring the equipment up to DOT or the seller's standards. In obtaining these values, Mr. Gaston utilized various references and published sources and also contacted equipment buyers and sellers for confirmation of market trends and values.

After the debtors ceased operations on June 30, 1998, Mr. Gaston was asked to appraise the one hundred twelve (112) Navistar units still in the debtors' possession and eventually was asked to appraise all one hundred forty-seven (147) Navistar units as of the Petition Date. He first estimated the retail value of the one hundred twelve (112) vehicles as of June 1998 and came up with an aggregate figure of $5,176,525. This figure assumes reconditioning costs of 9–10%. He then compared

the June 1998 values with similar information from August 1997. Specifically, he looked at the value in the NADA Commercial Truck Guide for September–October 1997, which included sales through August 1997, and at the NADA values for summer 1998. Based on his analysis, he calculated a decline in value of 9.44% from August 1997 to June 1998. Using this 9.44%, Mr. Gaston estimated that the retail value of the one hundred twelve units (112) had declined $539,602 during this same period. Therefore, in his opinion, the retail value of the one hundred twelve (112) units on the Petition Date was $5,716,127.

Using the same analysis, Mr. Gaston prepared an appraisal of the twenty-one (21) units sold to Miami Valley and the fourteen (14) units surrendered to Navistar in 1997. He concluded that the thirty-five (35) units had a retail value of $1,556,050 as of June 1998. Adding back $162,203, the 9.44% decline in value, he opined the retail value on the Petition Date was $1,718,253.

Mr. Gaston's total retail value for the Vehicles on the Petition Date was $7,434,380. From this figure, he deducted 9.5% reconditioning costs to arrive at a replacement value of $6,728,114.

Ralph Barnett, Navistar's expert, owns Leased Assets Services, an appraisal company he formed in 1994. He has been involved in the trucking industry much of his adult life from working as an over-the-road trucker to owning and operating his own nationwide carrier. Some 40–45% of Leased Assets Services' business relates to transportation, predominantly Class 8 tractors and trailers. Leased Assets Services buys and sells Class 8 equipment on behalf of clients and also performs appraisals.

In rendering an appraisal, Mr. Barnett physically inspects the unit and gathers information such as specifications and options, as well as mileage. He then goes to his market contacts with a general description of the vehicle and obtains a consensus from two or three contacts of the equipment's value on whatever basis it is to be sold. He may also use published sources such as NADA or Blue Book. He ultimately applies his own judgment and experience to arrive at a value.

Navistar engaged Mr. Barnett to randomly inspect the debtors' assets at the Columbus facility and to provide a written report consisting of his opinion of the fair market value of the assets. Mr. Barnett defined "fair market value" as "the price that a knowledgeable buyer would be willing to pay a knowledgeable seller for the equipment, with both the buyer and seller acknowledging that the assets must be sold in a commercially acceptable time frame and are being purchased 'as is, where is' with it being the buyer's responsibility to incur the expense to dismantle and remove the assets." Under this definition, no reconditioning is assumed.

The dates of Mr. Barnett's inspection were June 5, 1998, and June 6, 1998, while the debtors were still in business. He inspected twenty-three (23) of the one hundred ten (110) units on the list, as well as the specialty Peterbilt tractor and the specialty Kentucky trailer. According to his testimony, the rule of thumb is 17.5–20% of the fleet should be fairly indicative of value. He identified the major components and options which can affect value either positively or negatively, such as engine, transmission, wheels and Jake brakes. He also reviewed maintenance files, observed on-going maintenance procedures, and spoke with the maintenance supervisor. He found the equipment to be well-maintained, low mileage, and in generally better than expected condition.

In appraising the one hundred ten (110) units as of June 1998, Mr. Barnett assigned a fair market value for each category of equipment. He assumed that the units within each category had similar specifications, an assumption he believes was consistent with his observations and discussions with the debtors. He plugged in the quantity of vehicles in each category and arrived at an aggregate fair market value of $4,937,000 for the one hundred ten (110) units.

Mr. Barnett also reconstructed the fair market value of the one hundred ten (110) units as of the Petition Date. He took into account the general conditions he observed, the time of his inspection, and the mileages of the vehicles. He assumed that the condition of any unit on the Petition Date would be equal to or better than the condition existing in June 1998. He also spoke with his contacts as to what they thought similar equipment would have sold for on the Petition Date. His reconstructed aggregate fair market value of the one hundred ten (110) units was $5,873,000.

Mr. Barnett also reconstructed the fair market value for the other thirty-five (35) units which the debtors have sold or surrendered prior to his inspection. He determined the aggregate fair market value as of the Petition Date for all one hundred forty-seven (147) vehicles to be $7,781,500.

In addition to the experts' testimony, three other witnesses testified as to the value of the Vehicles. Curtis Jennings, the first of these witnesses, was the district operations manager for Navistar during the periods in question. In September 1997 he contacted Navistar's affiliated used truck center in an attempt to determine the value of the Vehicles. He pulled the line-set for each unit and provided these to Tom Weiss, the manager of the used truck center in Etna, Ohio. Mr. Weiss responded with a memorandum giving his valuation estimates. Using Weiss' figures and assuming a $100,000 combined price for the two specialty units, he calculated the value of the Vehicles to be $6,119,000. Mr. Jennings regarded this estimate as a wholesale value and believed Mr. Weiss had provided low values in order to make the Vehicles easier to sell for his part.

Around the same time, Mr. Jennings contacted Steve McDermott, who was then Navistar's manager of used truck sales and marketing. Based on the numbers supplied by Mr. McDermott, Mr. Jennings prepared a spreadsheet indicating a value of $6,561,850 for the Vehicles as of October 15, 1997. Mr. Jennings believed the numbers represented wholesale values. Mr. Jennings later used NADA figures and his own work product to come up with a retail value of $8.3 million.

Mr. Weiss testified that in arriving at his values he reviewed only the specifications faxed to him and did not physically inspect the Vehicles. He further stated that his values were for internal use only and represented amounts he believed the used truck center could readily obtain. His numbers, however, would not have changed had he calculated them as of the Petition Date.

Mr. McDermott testified that he came up with his values by looking at existing sales records for comparable equipment within the Used Truck Organization and by referring to the NADA Commercial Truck Guide. Using his "most likely" sales price for the 1994, 1995, and 1996 tractors, he calculated an aggregate retail value of $7,046,000 for one hundred forty-two (142) of the Vehicles. Assuming the 1993 tractor had a value of $35,000, the 4700 and the 4900 units, a value of $75,000, and the two specialty units, a value of $100,000, the aggregate retail value for all one hundred forty-seven (147) Vehicles was $7,256,000 in October 1997. Mr.

McDermott does not believe these values would have been any different on the Petition Date.

To arrive at replacement value, reconditioning expenses must be deducted. Mr. McDermott testified that the reconditioning expenses for the fourteen (14) units surrendered in 1997 was 8.44%. In contrast, the reconditioning costs for the one hundred twelve (112) units surrendered in July 1998 was approximately 9.8%. Mr. McDermott believes that for purposes of valuation on the Petition Date, the 8.44% would more closely approximate the actual reconditioning costs that would have been incurred for the one hundred twelve (112) units. Even so, he conceded that whether the 8.44% or the 9.5% used by Mr. Gaston was the correct standard, the difference in the replacement value would be negligible.

Mr. McDermott later testified on questioning by Navistar's attorney that the actual sales figures showed his estimates to have been too conservative. He theorized that a more reliable indicator of value as of the Petition Date would be obtained by adding a flat $6,000 depreciation allowance back into the actual sales figures attained by Navistar after June 30, 1998.

Having considered the valuation evidence, the Court finds little fault with the methodology employed by Mr. Gaston. He utilized standards familiar to this Court and his analysis was both thorough and understandable. Further, the valuations he ascertained bore a striking similarity to the sales prices actually achieved, and may even be described as generous compared to the values ascribed by Mr. McDermott in his memoranda to Mr. Jennings. Mr. McDermott's later incantation that a more reliable estimate of value could be gleaned from adding $6,000 back to the sales prices obtained in 1998 strikes this Court as far too arbitrary and not supported by the actual data.

Although comparable to Mr. McDermott's, the valuations placed on the Vehicles by Mr. Weiss are not as persuasive. The Court will take him at his word that his values reflected the prices he believed he could easily obtain at his used truck center and that he never would have given those numbers to anyone outside the Navistar organization.

As for Mr. Jennings' testimony regarding valuation, the Court concludes that it was helpful only insofar as he was able to calculate the Vehicles' aggregate value from the numbers supplied by Mr. McDermott and Mr. Weiss. The Court finds his own subsequent valuation in which he purported to have used NADA data and his own methodology wholly unconvincing. Mr. Jennings was not involved in the sale and marketing of used trucks and there was no evidence that he was qualified to interpret the NADA data much less render his own opinion of value.

That leaves the testimony and appraisal reports of Mr. Barnett. In contrast to Mr. Gaston, his use of the term "fair market value" appears novel, and the Court was left with no clear understanding of whether this value translated to the replacement value the Court was required to determine. Moreover, his valuations seem extreme when compared with the numbers arrived at by both Mr. Gaston and Mr. McDermott. His values also do not correspond well with the sales prices actually achieved. In fairness to Mr. Barnett, his physical inspection of the twenty-three (23) units appears to have been more thorough than that undertaken by Mr. Gaston. Yet the inspections yielded the same conclusion: the Vehicles were well-maintained and in better than expected condition. Given this fact, it is unfathomable that the Vehicles would have deteriorated as much as 20% in the 10–month period between the Petition Date and the cessation of the

782

debtors' business operations, particularly where it was the consensus of everyone involved that the used truck market remained strong throughout this period.

Based on the foregoing, the Court determines that the replacement value of the Vehicles on the Petition Date was no more than $6,728,114. Because the sum of the adequate protection payments and the net proceeds realized by Navistar from the sale of the Vehicles exceeds this replacement value, Navistar must return the excess amount ($68,468.52) to the debtors.

■ In addition to the question of Navistar's retention of the excess adequate protection payments, the debtors also objected to Navistar's claim to the extent it seeks recovery under 11 U.S.C. § 506(b) of postpetition interest and reasonable costs, fees, and other charges provided for in the Loan Agreements. The Court previously held that any entitlement by Navistar to a § 506(b) recovery could not exceed the difference between the replacement value and Navistar's claim apart from such interest, costs, fees, and charges. *TennOhio,* 247 B.R. at 722. Because its claim, not including those items, still exceeds the Vehicles' replacement value, Navistar is not entitled to any claim under § 506(b).

The parties stipulated that *all* of the issues concerning the debtors' objection to claim and motion for determination of Navistar's claim which were not resolved by the Opinion and Order on Crossmotions for Summary Judgment would be tried at the same time as the debtors' preference action. Notwithstanding this stipulation, their efforts at trial, apart from the preference issues, were directed almost exclusively to the question of whether Navistar must return any portion of the adequate protection payments. In addition, Navistar argues in its post-trial brief its entitlement to a claim under § 506(b). This Opinion and Order resolves those issues.

The parties shall determine the amount of Navistar's claim in a manner consistent with this Opinion and Order, the Opinion and Order on Debtors' Complaint for Recovery of Preferential Transfers, and the debtors' confirmed liquidating plan.

**IT IS SO ORDERED.**